## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

POLYWAD, INC.,

    Plaintiff,

v.

FEDERAL CARTRIDGE COMPANY and
VISTA OUTDOOR INC.,

    Defendants.

Case No. 5:23-cv-00460

**JURY TRIAL DEMANDED**

## ORIGINAL COMPLAINT

Plaintiff POLYWAD, INC. (hereinafter, "Polywad" or "Plaintiff"), brings this Original Complaint against Defendants VISTA OUTDOOR INC. (hereinafter, "Vista") and FEDERAL CARTRIDGE COMPANY (hereinafter, "Federal") (collectively, "Defendants"), for unjust enrichment, quantum meruit, breach of implied promises to pay for services (O.C.G.A. § 9-2-7), and promissory estoppel (O.C.G.A. § 13-3-44).

## NATURE OF THE ACTION

1.    This is an action for unjust enrichment, quantum meruit, breach of implied promises to pay for services and promissory estoppel to compensate for Defendants' misappropriation of Plaintiff's innovations and expertise without compensation.

2.    Plaintiff seeks injunctive relief and monetary damages, including the disgorgement of the awards that Defendants have won that were based on Polywad's innovations and expertise.

## PARTIES

3.    Plaintiff Polywad is a corporation organized and existing under the laws of the State of Georgia since November 4, 1985 with its principal place of business located at 120 Emory Greene Drive, Suite C1, Macon, Georgia, 31210 (Bibb County).

4.      Based upon public information, Defendant Federal is a corporation organized and existing under the laws of the State of Minnesota since April 27, 1922.

5.      Based upon public information, Defendant Federal maintains its principal place of business at 900 Ehlen Drive, Anoka, Minnesota, 55303 (Anoka County).

6.      Based upon public information, Federal may be served through its registered agent, CT Corporation System Inc., at 1010 Dale Street North, St. Paul, Minnesota, 55117-5603.

7.      Based upon public information, Federal does business under at least the names "Federal Ammunition," "Federal Premium," and "Federal Premium Ammunition."

8.      Based upon public information, Federal also does business under the names "Alliant Powder," "BLACKHAWK!," "BLACKHAWK! Manufacturing," "RCBS," and "CCI/Speer."[1]

9.      Based upon public information, Vista is a corporation organized and existing under the laws of the State of Delaware since April 24, 2014.

10.     Based upon public information, Vista is registered with the Minnesota Secretary of State as a foreign corporation.

11.     Based upon public information, Vista has its principal place of business located at 1 Vista Way, Anoka, Minnesota, 55303 (Anoka County).

12.     Based upon public information, Vista may be served through its registered agent, CT Corporation System Inc., at 1010 Dale Street North, St. Paul, Minnesota, 55117-5603.

13.     Based upon public information and its characterization of Federal as one of its "brands," Federal is owned or otherwise controlled by Vista.

---

[1] Source: Form 10-K for Vista Outdoor Inc. for its fiscal year ending March 31, 2020, Exhibit 21.

## JURISDICTION AND VENUE

14.     This action arises under the laws of the State of Georgia.

15.     With respect to Claims I, II, and III, and IV, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount of damages exceeds $75,000 and the parties are citizens of different states (pursuant to 28 U.S.C. § 1332(c)(1)).

16.     The Court has personal jurisdiction over Vista and Federal because: Defendants have minimum contacts within the State of Georgia and in this District; Defendants have purposefully availed itself of the privileges of conducting business in the State of Georgia and in this District; Defendants have sought protection and benefit from the laws of the State of Georgia; Defendants regularly conduct business within the State of Georgia and within this District, and Plaintiff's causes of action arise directly from Defendants' business contacts and other activities in the State of Georgia and in this District.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the work by Plaintiff for which it was not paid by the Defendants was performed in this District.

## BACKGROUND INFORMATION

### About Polywad

18.     Polywad is currently engaged in the business of designing ammunition, as well as consulting with manufacturing companies, and up until 2017, Polywad also manufactured ammunition.

19.     James Y. ("Jay") Menefee, III (hereinafter, "Mr. Menefee") is Polywad's principal officer.

20.     For the better part of thirty years, Mr. Menefee has focused his professional efforts on improving the design and performance of ammunition sold by manufacturers in the hunting industry. He built and operated the Polywad, Inc. shotgun shell loading plant where he designed

and manufactured a large line of specialty shotgun shells.  He also loaded and designed shotgun shells for more than a dozen USA and foreign companies, which ranged from startups to the world's largest shotgun shell manufacturers.

21.     The superior quality of his work has been acknowledged by way of (1) his products receiving top industry awards by Field and Stream Magazine and the National Rifle Association; (2) his inventions having been granted patent protection by the United States Patent and Trademark Office ("USPTO"); and (3) his expertise being sought by companies within the industry, including the defendants in this lawsuit.

### Mr. Menefee's Previous Working Arrangements With Entities Related To Defendants

22.     For approximately twenty years, Mr. Menefee and Polywad enjoyed a good working relationship with Vista, or one of its current subsidiaries.  During this time, the companies jointly worked on three separate projects, all three of which resulted in large volumes of product sales that continue today.

23.     The *first* project began in 1998 when Mr. Menefee presented a patented bullet to CCI of Lewiston, Idaho, which is now a subsidiary of Vista.

24.     After several years in which CCI manufactured products for Polywad, the companies entered into a royalty arrangement in 2001 (hereinafter, the "CCI Agreement") whereby CCI paid Polywad royalties for the right to produce and sell products using Polywad's patented technology.

25.     Based upon public information, CCI continues to produce multiple variations of these products today.

26.     The CCI Agreement ended in 2007.

27.     In 2003, a *second* project was undertaken.  Federal entered a licensing agreement with Polywad whereby Federal was granted the right to utilize Mr. Menefee's design for improving

the accuracy of shotgun slug loads. The agreement between Mr. Menefee and Federal covered an expansive product line, including hollow-based, lead or non-toxic metal shotshell "slugs."

28.     The agreement between Mr. Menefee and Federal (hereinafter, the "Tru Ball Agreement") was not only broad in scope but also duration. For ten years this working arrangement served to the mutual benefit of both Federal and Polywad.

29.     Mr. Menefee worked closely with Mr. Dave Henderson (hereinafter, "Mr. Henderson"), the Supply Chain Director of Federal.

30.     Federal promoted its product, "Tru Ball," as one of the most advanced designs in fifty years. Federal not only marketed the product for hunting, but also makes a special version for law enforcement. As with the products at issue in this Complaint, Mr. Menefee was the inventor of the "Tru Ball" technology, which was used and has been used by Federal ever since.

31.     Federal has and continues to generate millions of dollars of sales related to this project.

32.     Mr. Menefee and Polywad were compensated by way of royalty payments totaling approximately $750,000.

33.     The Tru Ball Agreement ended in 2014.

### The Auto-Segmenting Project

34.     Approximately one year following the conclusion of the Tru Ball Agreement, Mr. Menefee and Federal re-engaged in business discussions related to a *third* project involving certain properties and product designs of Polywad for an "Auto-Segmenting Spherical Projectile" (hereinafter, the "Auto-Segmenting project"). These products embodied Mr. Menefee's technologies.

35.     Polywad and Federal entered into a 5-year Non-disclosure Agreement (hereinafter, the "NDA") in August of 2015 which included the Auto-Segmenting project. *See* **Exhibit A.**

36.     The NDA for the Auto-Segmenting project (the agreement under which Mr. Menefee presented the auto segmenting technology) was presented to Mr. Menefee by Mr. Henderson.

37.     One month later, in September of 2015, Mr. Menefee sent Federal confidential materials that included items that covered the Auto-Segmenting Spherical Projectiles.

38.     These proprietary materials included drawings and descriptions, as well as photographs taken during the testing of Polywad's Auto-Segmenting Spherical Projectile products.

39.     The photographs, drawings and descriptions provided to Federal by Mr. Menefee included depictions of pellet-like spherical sub-projectiles which are incorporated into the manufacture of shot-gun shells (a/k/a "shotshells" or "shells").  *See* **Exhibit B**.

40.     The photographs clearly depicted the design of the pellets and the action of the pellets when incorporated into a shotgun shell and fired by a shotgun.

41.     These proprietary materials including but not limited to the photographs, were provided to Mr. Henderson.

42.     Mr. Henderson shared the proprietary materials with Mr. Rick Stoeckel, the Director of Brand Management for Federal (hereinafter, Mr. Stoeckel).

## **The SHOT Show**

43.     Mr. Menefee was then invited to make a presentation of his Auto-Segmenting concepts to Federal's Sales, Marketing and Engineering team during the January, 2016 Shooting, Hunting and Outdoors Trade Show in Las Vegas, Nevada (hereinafter, the "SHOT Show").

44.     In advance of the January 2016 SHOT Show, Federal requested Mr. Menefee's assistance on a separate project related to shotgun shells used for dove hunting, referred to as "Dove Loads."  Federal paid for Mr. Menefee's trip to its offices in Anoka, Minnesota in late 2015 for this purpose.  In a follow-up email, Mr. Menefee explained that consulting on projects like the

Dove Loads would be billed at his hourly rates while projects involving his inventions would not be billed in such manner; rather, such endeavors involving his inventive designs would be compensated pursuant to a royalty-based arrangement as was the case under the CCI Agreement and the Tru Ball Agreement.

45.     Mr. Menefee attended the 2016 SHOT Show and as requested, made a presentation of his Auto-Segmenting concepts to Mr. Stoeckel and his marketing team at Federal.  The sharing and discussion of these confidential materials included edge-hinged pellet design,  center-hinged pellet design, and compacted powder metal pellet design, all designs being covered by the NDA.

46.     The parties agreed that work on the Auto-Segmenting project would be compensated by way of a royalty arrangement related to products developed utilizing Mr. Menefee's technology.

47.     While the parties continued to address the details of the agreement in the months going forward, there was clear acknowledgment at the Shot Show meeting that the work performed would be compensated on a royalty basis.

48.     The actions of the parties following the meeting at the Shot Show confirm that this agreement had been reached.

49.     Erik Carlson, Federal's Senior Director of Operations (hereinafter, "Mr. Carlson"), attended the presentation at the SHOT Show.  Following Mr. Menefee's presentation to Federal's team, Mr. Menefee recommended to Mr. Carlson that they approach a manufacturer with whom Mr. Menefee had previously engaged in manufacturing special projectiles for shotgun cartridges, Abbott Ball Company.

50.     Mr. Carlson responded favorably to Mr. Menefee's recommendation and let him know that Federal was moving forward in addressing details for the agreement which had been

reached between Federal and Mr. Menefee at the Shot Show. Mr. Carlson's email, dated February 20, 2016, stated: "Sounds like a good company. I wonder if their goal is to be a supplier? I have a meeting with Dave, Rick and drew next week to talk details on the agreement."

51.     In advance of the meeting with Abbott Ball, Mr. Menefee contacted its president, Mr. Craig Bond, and informed him of the specifications for the pellets.

52.     During the visit to Abbott Ball Company, Mr. Carlson and Mr. Menefee met with Mr. Bond, as well as with Abbott Ball's engineers, and discussed the pellet specifications and methods of manufacture for the pellets to be produced.

53.     Following the meeting with Abbott Ball, Federal issued a purchase order to Abbott Ball for the manufacture of sample pellets.

54.     Later in 2016, on or about October 17, Federal scheduled a conference call with Mr. Menefee to discuss more details related to the royalty arrangement.  The email from Federal requesting this call was entitled, "Discussion: Fragmenting Shot Agreement."

55.     Those present on the call included a half dozen relatively high-level personnel from Federal, including Mr. Stoeckel, Mr. Carlson, Mr. Drew Goodlin (Senior Director of Technology) Mr. Dan Compton (Assistant Brand Manager), Mr. Larry Head (Associate Ammunition Engineer), and Mr. Tyson Schmidtke (Supply Chain Manager, filling the role for the retiring Mr. Dave Henderson).

56.     During the October 17, 2016 conference call, Federal confirmed that the Auto-Segmenting work would be performed on a royalty-based arrangement and that the Tru Ball Agreement would serve as a model or template for such work.

57.     Mr. Menefee sent a follow-up email to Mr. Carlson confirming that the royalty-based Tru Ball Agreement would be used as a model for the collaborative work between Polywad and Federal related to the Auto-Segmenting project.

58.      At the January 2017 SHOT show Mr. Carlson arranged meetings with projectile manufacturers that Federal used as suppliers. One of these meetings was with Spherical Precision of Irvine, California.

59.     A second meeting was with STR Industries of Centereach, New York.

60.     Mr. Menefee was invited to both meetings and was introduced by Mr. Carlson as the inventor of the projectile designs being discussed.

61.     The principals of Spherical Precision and of STR Industries present at the meetings signed the NDA provided by Mr. Carlson, who informed them that the designs presented were Federal's property based on it having obtained the rights to utilize Mr. Menefee's inventions.

62.     These two meetings, as well as similar meetings with other companies, involved Federal representatives discussing the potential for those companies to manufacture components for Federal of Polywad's designs.

**<u>Defendants Use Polywad's Technology To Manufacture And Sell Their Products.</u>**

63.     Federal's efforts to find manufacturers for the Menefee/Polywad-designed pellets continued into 2017, 2018 and 2019.  The designs included the center-hinged and edge-hinged pellets made of steel or lead, and the non-hinged compacted powder metal.  The steel-manufactured pellets were to be incorporated in shotgun shells sold for waterfowl hunting.  The lead-manufactured pellets were for incorporation into shotgun shells sold for purposes of home defense, as discussed below. Compacted powder metal designs were considered for both waterfowl and personal defense applications.

64.     In early 2017, Federal informed Mr. Menefee that while it remained interested in developing a steel shot pellet for waterfowl hunting, its primary focus was now in developing a large "buckshot"-sized lead pellet made according to his center-hinged design, to be sold for purposes of personal home defense.

65.     Mr. Menefee focused his efforts accordingly.  For approximately two years, from early 2017 to early 2019, Federal and Polywad collaborated in producing auto segmenting spherical projectiles for this particular segment of the market.

66.     Polywad's contribution to this collaborative work included not only Mr. Menefee's Auto-Segmenting design and his advice related thereto, but also the use of a special buckshot casting tool Polywad had manufactured.

67.     This casting tool was initially shipped to a supplier of Federal for its use in determining and preparing manufacturing quotes for Federal.

68.     The casting tool was later shipped to Federal's research and development department for its use.

69.     In communicating with potential suppliers of the lead pellets, Federal provided those companies with engineering drawings for the center-hinged pellets.

70.     These engineering drawings were almost exact copies of the design drawings Mr. Menefee had provided to Federal in 2015.

71.     In the title block of its engineering drawings, Federal included the following statement: "PROPRIETARY: THE INFORMATION CONTAINED IN THIS DOCUMENT IS THE PROPERTY OF FEDERAL CARTRIDGE COMPANY."  At this time, Mr. Menefee and Polywad were not concerned that Federal was marking their inventions in this way.  This was

consistent with the previous course of conduct between Federal and Mr. Menefee/Polywad, including, for instance, during the Tru Ball agreement.

72.     Throughout 2017, 2018, and early 2019, Mr. Menefee did as directed by Federal, focusing his efforts on the center-hinged design.

73.     In late summer of 2019, Federal changed course, making the strategic decision to utilize Polywad's edge-hinged design, rather than the center-hinged design, in Federal's production of lead buckshot pellets.  Mr. Schroeder later sent Mr. Menefee photos of the auto-segmenting buckshot pellets that Federal was producing.  He also sent Mr. Menefee a lab test photograph of a gelatin block test demonstrating how well these auto segmenting pellets worked when fired.

74.     The edge-hinged design in the photos of the pellets and the lab test photograph sent by Mr. Schroeder to Mr. Menefee, and the edge-hinged design ultimately utilized in the sales of Federal shotgun shells, were based upon the technology provided to Federal by Mr. Menefee on behalf of Polywad in September of 2015.

## Defendants Renege On Their Obligations To Polywad

75.     At no time, from the signing of the NDA in August, 2015, through the August 30, 2019 conversation between Mr. Schroeder and Mr. Menefee, was there any mention by any Vista employee or any Federal employee that Mr. Menefee and/or Polywad would not be compensated for their work related to the Auto-Segmenting project.

76.     To the contrary, the working arrangement repeatedly acknowledged by Mr. Menefee on behalf of Polywad and by Federal was that Polywad would be compensated for Federal's use of Polywad's technology and investment of time, and that such compensation would be by way of royalties based on the sales of products utilizing this information.

77. The fact that the working arrangement between Federal and Polywad was not reduced to writing was not of concern to Polywad or Mr. Menefee during the four years of work on the Auto-Segmenting project. This is because of the twenty-year working relationship between Federal, its sister companies and Mr. Menefee and Polywad, including the fact that the Tru Ball Agreement likewise was not signed until a few months before Federal began sales of the related products.

78. During the last quarter of 2019 and the first quarter of 2020, communications took place between counsel for Federal and counsel for Polywad in an effort to address additional details of the royalty agreement. After these efforts failed, later in 2020, Mr. Menefee sent detailed emails and documents delivered directly to Federal. In December of 2022, Mr. Menefee also sent detailed printed letters and documents to five executives of Federal in attempts to have his concerns addressed. Ultimately, it became apparent to Polywad and Mr. Menefee that Federal was not going to fulfill its promise to compensate Polywad and Mr. Menefee by way of royalties on products utilizing his technology, which has resulted in this complaint being brought against Defendants.

79. Permission to sell products utilizing Polywad's technology relating to the Auto-Segmenting project could only have come from Mr. Menefee.

80. Mr. Menefee never gave Vista permission to sell products utilizing Polywad's technology related to the Auto-Segmenting project absent compensation and payment for the same.

81. Mr. Menefee never gave Federal permission to sell products utilizing Polywad's technology related to the Auto-Segmenting project absent compensation for the same.

82. Mr. Menefee never gave permission to sell products utilizing Polywad's technology relating to the Auto-Segmenting project to any of Vista's other branded entities.

83.     Defendants have marketed and sold shotgun shells based on Polywad's technology relating to the Auto-Segmenting project.

84.     Neither Defendant has paid any royalties to Polywad for shotgun shells based on Polywad's technology relating to the Auto-Segmenting project that they have marketed and sold.

85.     Defendants' failure to compensate Polywad for its technology related to the Auto-Segmenting project represents bad faith on the part of Defendants, particularly where they had previously entered into two previous agreements to compensate Polywad for its other work performed for the Defendants.

86.     During the period in which the Parties have been engaged in the Auto-Segmenting project, Mr. Menefee has spent approximately 1250 hours working on it.

87.     During the period in which the Parties have been engaged in the Auto-Segmenting project, Mr. Menefee's consulting rate was $150/hour.

88.     Polywad expended approximately $15,000 for materials, supplies, and tools that were directly related to the Auto-Segmenting project.

**Defendants Won Multiple Awards Based On the Misappropriated Technology**

89.     Defendants have reaped and continue to reap the benefits of misappropriating Polywad's technology.

90.     For instance, Defendants have won a multitude of awards for the products that incorporate Polywad's technology.

91.     As an example, Defendants won the Editor's Choice Award from On Target Magazine for the Force X2 technology.

The Editors' Choice Award we're giving Federal for its new Force X2 Shorty 12-gauge shotshells isn't solely based on the fact that we now have another very-solid choice for truncated 1-3/4 12-gauge ammo that can be stacked much deeper in a magazine tube than standard 2-3/4 and 3-inch shells, but also its unique payload.

Each Force X2 Shorty shell holds six of Federal's 00 segmenting copper-plated-lead buckshot pellets, designed to split into two halves upon impact. This effectively doubles the wound channels and offers the greatest terminal performance of any of the current mini-shotshell offerings.

*See*   https://www.ontargetmagazine.com/2023/04/2022-editors-choice-award-winning-federal-force-x2-shorty/ (last visited October 31, 2023).

92.     Defendants also won the Best Ammunition Caliber Award for 2020 by NASGW-POMA for the Force X2 technology that was stolen from Polywad.

Federal Premium Force X2 Personal Defense Shotgun Loads has been presented with the Caliber Award in the Best Ammunition New Product category by the National Association of Sporting Goods Wholesalers (NASGW), in partnership with the Professional Outdoor Media Association (POMA).

"We are thrilled to have won Best Ammunition for our Premium Force X2 at the 4th Annual NASGW-POMA Caliber Awards," said Federal's Vice President of Sales Jim Bruno. "The Caliber Awards are chosen by a dedicated group of wholesalers and media members who stay on top of product trends and innovations year after year. We know these individuals truly saw the value of all the features and benefits Force X2 delivers to any customer looking for the most innovative and effective personal defense load for shotguns. We are incredibly proud of this award."

*See*   https://soldiersystems.net/2020/10/29/federal-premium-force-x2-wins-the-best-ammunition-caliber-award-for-2020-by-nasgw-poma/ (last visited October 31, 2023).

93.     As a third example, Defendants also received the Golden Bullseye Award for Polywad's technology.  "The National Rifle Association's (NRA) Shooting Illustrated magazine selected Federal's Force X2 shotshell to receive the Golden Bullseye Award for 2022 Ammunition Product of the Year."   https://www.thedealerwire.com/releases/ed3c0872-67a8-4bdc-b1fe-4e2817db5b39 (last visited October 31, 2023).

94.     Moreover, Defendants received Editor's Selects Awards from Ballistic's Best magazine.  "Ballistic's Best magazine recently recognized Federal's Force X2 and Practice & Defend Packs with Editor's Selects Awards for the best new shotgun and handgun ammunition

---

from the previous year. The awards were announced in the publication's recent December 2020 / January 2021 issue."

95.     But for Defendants' use of Polywad's technology, they would never have received any of these awards, which provided a substantial and material benefit and value to Defendants.

## COUNT I: UNJUST ENRICHMENT

96.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

97.     Defendants induced or encouraged Polywad to provide something of value to the Defendants, namely the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology, by engaging Polywad in the Auto-Segmenting project.

98.     Polywad provided something of value to the Defendants, namely the expertise of Mr. Menefee, its assistance with manufacturing, and its technology, for the Auto-Segmenting project.

99.     Based upon explicit representations by Defendants as well as having entered into two previous agreements with at least one of the Defendants to be paid royalties for its work, Polywad had a reasonable expectation that it would be compensated for its work on the Auto-Segmenting project in the form of royalties from the sale of Defendants' products that were derived from the Auto-Segmenting project.

100.    Defendants actively sought, received, and accepted the benefit of the expertise of Mr. Menefee, its assistance with manufacturing, and its technology, for the Auto-Segmenting project, evidence of which is clear from its sale of products derived from the Auto-Segmenting project.

101.    Based upon statements made to Mr. Menefee by officers of Federal and the experience of Polywad drawn from the CCI Agreement and the Tru Ball Agreement, Polywad had a reasonable and legitimate expectation that it would be paid royalties by Defendants in exchange

for providing the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology for Defendants' products derived from the Auto-Segmenting project.

102.    Therefore, Polywad is entitled to receive from Defendants appropriate royalties from the sale by Defendants of current and future products derived from the Auto-Segmenting project, or at a minimum, all compensation that is justifiable under the law for its efforts that were solicited, accepted, and used by Federal to enrich itself to Polywad's detriment, including all benefits and value from the awards Defendants wrongfully received.  Polywad further is entitled to disgorgement of all benefits and value from the awards Defendants wrongfully received, including the awards themselves.

## COUNT II: QUANTUM MERUIT

103.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

104.    Polywad provided something of value to the Defendants, namely the expertise of Mr. Menefee, its assistance with manufacturing, and its technology, for the Auto-Segmenting project.

105.    Defendants requested that Polywad provide to the Defendants the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology, by engaging Polywad in the Auto-Segmenting project.

106.    Defendants' acceptance of the expertise of Mr. Menefee, of Polywad's assistance with manufacturing, and of Polywad's technology for the Auto-Segmenting project without having to compensate Polywad would allow Defendants to unjustly profit at the expense of Polywad.

107.    Based upon statements made to Mr. Menefee by officers of Federal and the experience of Polywad drawn from the CCI Agreement and the Tru Ball Agreement, Polywad had a reasonable and legitimate expectation that it would be paid royalties by Defendants in exchange

for providing the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology for Defendants' products derived from the Auto-Segmenting project.

108.    Therefore, Polywad is entitled to receive from Defendants appropriate royalties from the sale by Defendants of current and future products derived from the Auto-Segmenting project, or at a minimum, all compensation that is justifiable under the law for its efforts that were solicited, accepted, and used by Federal to enrich itself without accounting for Polywad's efforts, including all benefits and value from the awards Defendants wrongfully received.  Polywad further is entitled to disgorgement of all benefits and value from the awards Defendants wrongfully received, including the awards themselves.

## COUNT III: BREACH OF IMPLIED PROMISE TO PAY FOR SERVICES UNDER O.C.G.A. § 9-2-7

109.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

110.    Polywad provided to Defendants a valuable service in the form of the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology for the Auto-Segmenting project.

111.    Defendants accepted this service by using the information and technology provided to develop, manufacture, market, and sell their products that incorporate the technology from the Auto-Segmenting project.

112.    Based on statements made to Mr. Menefee by officers of Federal and the experience of Polywad drawn from the CCI Agreement and the Tru Ball Agreement, Polywad had a reasonable and legitimate expectation that it would be paid royalties by Defendants in exchange for providing the expertise of Mr. Menefee and Polywad's technology.

113.    Therefore, Polywad is entitled to receive from Defendants appropriate royalties from the sale by Defendants of current and future products derived from the Auto-Segmenting

project, or at a minimum, all compensation that is justifiable under the law for its efforts that were solicited, accepted, and used by Federal to enrich itself to Polywad's detriment, including all benefits and value from the awards Defendants wrongfully received. Polywad further is entitled to disgorgement of all benefits and value from the awards Defendants wrongfully received, including the awards themselves.

## **COUNT IV: PROMISSORY ESTOPPEL/VIOLATION OF O.C.G.A. § 13-3-44**

114.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

115.    Polywad provided to Defendants a valuable service in the form of the expertise of Mr. Menefee, Polywad's assistance with manufacturing, and Polywad's technology for the Auto-Segmenting project.

116.    As further described above, Defendants promised that they would pay royalties to Polywad in exchange for using the information and technology provided to develop, manufacture, market, and sell their products that incorporate the technology from the Auto-Segmenting project.

117.    Based on statements made to Mr. Menefee by representatives of Federal and the experience of Polywad drawn from the CCI Agreement and the Tru Ball Agreement, Polywad had a reasonable and legitimate expectation that it would be paid royalties by Defendants in exchange for providing the expertise of Mr. Menefee and Polywad's technology.

118.    Polywad did rely on those promises to its detriment.  Polywad was never compensated in royalties or any other form for its work and provisions of valuable expertise and technology.

119.    Defendants accepted this service by using the information and technology provided to develop, manufacture, market, and sell their products that incorporate the technology from the Auto-Segmenting project.

120.    An injustice can be avoided only by the enforcement of the promise to pay royalties and/or other compensation because the plaintiff surrendered, forewent, and rendered valuable rights in his expertise and technology and received nothing in return.

121.    Therefore, Polywad is entitled to receive from Defendants appropriate royalties from the sale by Defendants of current and future products derived from the Auto-Segmenting project, or at a minimum, all compensation that is justifiable under the law for its efforts that were solicited, accepted, and used by Federal to enrich itself to Polywad's detriment, including all benefits and value from the awards Defendants wrongfully received. Polywad further is entitled to disgorgement of all benefits and value from the awards Defendants wrongfully received, including the awards themselves.

## **JURY DEMAND**

122.    Plaintiff demands a trial by jury on all issues.

## **PRAYER FOR RELIEF**

123.    Plaintiff respectfully requests the following relief:

    A.    An adjudication that Defendants, either individually or jointly, were unjustly enriched by their acceptance of the benefits of receiving Polywad's expertise, its assistance, and its technology;

    B.    An adjudication that Defendants, either individually or jointly, are liable under the theory of quantum meruit by their acceptance of the benefits of receiving Polywad's expertise, its assistance, and its technology;

    C.    An adjudication that Defendants, either individually or jointly, are liable under O.C.G.A. § 9-2-7 by their acceptance of the benefits of receiving Polywad's expertise, its assistance, and its technology;

D.  An adjudication that Defendants, either individually or jointly, are liable under O.C.G.A. § 13-3-44 by their making of the promises outlined above with reasonable expectation that Polywad would rely on those promises, which it did to its detriment, and that injustice can be avoided only by the enforcement of the promises above because Polywad surrendered, forewent, and rendered value, as described above, to the Defendants;

E.  An award of appropriate royalties from the sale by Defendants of current and future products derived from the Auto-Segmenting project, or at a minimum, all compensation to Polywad that is justifiable under the law for its efforts that were solicited, accepted, and used by Federal;

F.  Disgorgement of all benefits and value from the awards Defendants wrongfully received, including the awards themselves;

G.  Its costs of litigation under O.C.G.A. § 13-6-11 for at least Defendants' acts in bad faith; and

H.  Such other relief as this Court deems appropriate.

DATED: <u>November 14, 2023</u>        <u>*/s/ James F. McDonough, III*</u>

Timothy C. Davis (AL Bar No. 6834D63T)*
**HENINGER GARRISON DAVIS, LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone: (205) 327-9115
Facsimile: (205) 807-2715
Email: tim@hgdlawfirm.com

James F. McDonough, III (GA Bar No. 117088)
Jonathan R. Miller (GA Bar No. 507179)
**ROZIER HARDT MCDONOUGH PLLC**
659 Auburn Avenue NE, Unit 254
Atlanta, Georgia 30312
Telephone: (404) 564-1866, -1863
Email: jim@rhmtrial.com
Email: miller@rhmtrial.com

C. Matthew Rozier (CO Bar No. 46854)*
**ROZIER HARDT MCDONOUGH PLLC**
500 K Street, 2nd Floor
Washington, District of Columbia 20005
Telephone: (404) 779-5305
Email: matt@rhmtrial.com

*for Plaintiff*

* Admission *Pro Hac Vice* anticipated

<u>LIST OF EXHIBITS</u>
    A.  Non-Disclosure Agreement Between The Parties
    B.  Menefee Package to Federal